# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

ARTHUR LUZELL TARVIN, :

    Plaintiff, :

vs. : CA 13-0033-C

CAROLYN W. COLVIN, :
Acting Commissioner of Social Security,
:
    Defendant.

## MEMORANDUM OPINION AND ORDER

The Plaintiff brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Doc. 22 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings."); *see also* Doc. 24 (order of reference).) Upon consideration of the administrative record ("R.") (doc. 13), the Plaintiff's brief (doc. 14), the Commissioner's brief (doc. 16), and the arguments presented at the November 21, 2013 hearing, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

---

[1] Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* doc. 22 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for

#### I. Procedural Background

On or around September 21, 2010, the Plaintiff filed an application for DIB and SSI (R. 122-130), alleging disability relating to a left knee injury that occurred on January 30, 2009, and required a left total knee replacement (*see* R. 62-63, 122, 126). His application was initially denied on February 3, 2011 (R. 64-66). A hearing was then conducted before an Administrative Law Judge on March 23, 2012. (R. 35-61). On May 16, 2012, the ALJ issued a decision finding that the claimant was not disabled (R. 20-31), and, on October 24, 2012, the Plaintiff sought review from the Appeals Council (R. 12-13). On December 20, 2012, the Appeals Council issued a decision declining to review the ALJ's decision. (R. 1-3.) Therefore, the ALJ's determination was the Commissioner's final decision for purposes of judicial review. *See* 20 C.F.R. § 404.981. The Plaintiff filed a Complaint in this Court on January 24, 2013. (Doc. 1.)

#### II. Standard of Review and Claims on Appeal

In all Social Security cases, the plaintiff bears the burden of proving that he or she is unable to perform his or her previous work. *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the plaintiff has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the plaintiff's age, education, and work history. *Id.* Once the plaintiff meets this burden, as here, it becomes the Commissioner's burden to prove that the plaintiff is capable—given his or her age, education, and work history—of engaging in another kind of substantial gainful employment that exists in the national economy. *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

---

this judicial circuit in the same manner as an appeal from any other judgment of this district court.").)

The task for this Court is to determine whether the ALJ's decision to deny Plaintiff benefits, on the basis that he can perform those light jobs identified by the vocational expert at the administrative hearing, is supported by substantial evidence. Substantial evidence is defined as more than a scintilla, and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "In determining whether substantial evidence exists, [a court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 Fed. App'x 995, 996 (11th Cir. Apr. 1, 2010) (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). And, "[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence." *Id.* (citing *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)).

On appeal to this Court, the Plaintiff asserts two claims:

1. The Commissioner's decision should be reversed because the ALJ did not state with any particularity the reasons for his rejection of the opinion of the consultative examiner, Dr. Huey Kidd; and

2. The Commissioner's decision should be reversed because the ALJ failed to further develop the record with regards to a perceived ambiguity in Dr. Kidd's report.

(Doc. 14 at 5.) For the reasons discussed below, because the Court finds that the ALJ did not err with regard to his determination regarding Dr. Kidd's opinion, the Commissioner's decision denying the Plaintiff benefits should be affirmed.

### III. Relevant Medical Evidence

Following the Plaintiff's work injury on January 30, 2009, the Plaintiff was treated by Dr. Christopher Patton. (R. 216.) The Plaintiff reported to Dr. Patton that he twisted his knee at work when he fell off some steps. (*Id.*) Dr. Patton ordered an MRI of the Plaintiff's left knee, which showed a torn meniscus; partial tears of the anterior cruciate ligament, posterior cruciate ligament and medial collateral ligament; and the presence of a 1.2 cm bony fragment. (R. 217-19.) Dr. Patton recommended arthroscopic knee surgery to debride the meniscus tear. (R. 219.) On March 12, 2009, Dr. Patton performed arthroscopic surgery of the left knee, in which he debrided the tears of the medial and lateral meniscus and removed the loose body in the knee. (R. 221-22.) Dr. Patton's post-operative diagnoses were: medial meniscus tear; small lateral meniscus tear; loose body in the left knee; and osteoarthritis in the medial compartment of the left knee. (R. 221-23.) Dr. Patton recommended that the Plaintiff wear a knee brace, visit physical therapy to obtain a home exercise program, and return for a follow-up visit in six weeks. (R. 223.) Additionally, Dr. Patton prescribed pain mediation for the Plaintiff and recommended work restrictions of "no squatting, no crawling, no more than four steps on a ladder, and no lifting greater than 30 pounds." (*Id.*) The Plaintiff returned to see Dr. Patton for multiple post-operative visits (*see* R. 223-26, 233-35); he continued to complain of persistent knee pain without significant improvement (*see id.*). On August 31, 2009, Dr. Patton concluded that the Plaintiff may benefit from knee replacement surgery. (R. 235.) Dr. Patton referred the Plaintiff to Dr. Michael Granberry for an evaluation for total knee replacement surgery. (*Id.*)

On September 30, 2009, the Plaintiff visited Dr. Granberry. (R. 236.) Dr. Granberry performed a physical examination, reviewed the Plaintiff's x-rays and concluded that the Plaintiff had post traumatic arthritis of the left knee; medial and

4

lateral meniscus tears of the left knee; and a left knee strain. (*Id.*) Dr. Granberry recommended total left knee replacement surgery. (*Id.*) The knee replacement surgery was performed, without complications, by Dr. Granberry on December 14, 2009. (R. 239-42.) The Plaintiff returned to see Dr. Granberry for a post-operative visit on February 17, 2010. (R. 244.) X-rays indicated that "the knee replacement [was] in good position with no evidence of wear, loosening or complication." (*Id.*) Dr. Granberry's impression was "post traumatic arthritis, left knee" and "status post left total knee replacement." (*Id.*) The Plaintiff had been going to physical therapy and Dr. Granberry ordered that he continue with his physical therapy plan. (*Id.*) The Plaintiff complained of pain and tightness in his knee, but Dr. Granberry "reassured him that his knee [was] actually doing quite well." (*Id.*) Dr. Granberry advised the Plaintiff that he "need[ed] to work a little more on extension and not sit quite so much." (*Id.*) On April 29, 2010, Dr. Granberry saw the Plaintiff again and noted that the Plaintiff reported he had experienced "decreased pain and still ha[d] some tender spots and some stiffness but in general [was] doing relatively well." (R. 248.) Dr. Granberry concluded that the Plaintiff had reached maximum medical improvement and that he had an "impairment rating of 25 percent of the lower extremity for a well functioning total knee replacement." (*Id.*) Dr. Granberry found Plaintiff's "permanent restrictions [were] 50 pounds lifting, no crawling, squatting, kneeling, or climbing." (*Id.*) Dr. Granberry prescribed Lidoderm patches for the Plaintiff's pain. (*See id.*)

On December 6, 2010, Dr. Huey Kidd, a family practice physician, performed a consultative examination of the Plaintiff. (R. 269-70.) Dr. Kidd made the following pertinent findings after conducting a physical examination:

> He has full range of motion and 5/5 strength of the upper extremity. He is only able to bend his knee about 15 degrees past the neutral of 90. The right leg moves normally. . . . He is unable to heel walk, unable to toe walk,

5

> unable to bend and touch his toes. He did try to squat, he was only able to squat about 15 to 20 degrees. He ambulates with a severe atalgic gait using a cane and using it appropriately.

(R. 270.) Dr. Kidd also reviewed x-ray imaging of the Plaintiff's lumbar spine and noted that the images "reveal[ed] straightening of the lumbar lordosis and some minimal degenerative disc disease at L4-L5. The straightening could be due to osteoarthritis." (*Id.*) Dr. Kidd's impression was "[o]steoarthritis of the knees with total left knee replacement and back pain which is radicular in nature." (*Id.*) Dr. Kidd further commented that he "believe[d] it would be very difficult for [the Plaintiff] to work." (*Id.*)

On January 13, 2011, one year following his knee replacement surgery, the Plaintiff again saw his orthopedic surgeon, Dr. Granberry, and complained of left knee pain. (R. 271.) The Plaintiff was "not taking any pain medication" and was "occasionally doing his exercises." (*Id.*) Dr. Granberry performed a physical examination, which "show[ed] a benign knee with a well healed wound. No swelling, deformity, [or] redness . . . [.] His tenderness [was] predominantly in his calf musculature about midway down[.] Range of motion [was] 0 to 115 degrees. [There was] [n]o instability." (*Id.*) X-rays of the left knee "show[ed] the knee prosthesis in good position with no evidence of wear, loosening or complication." (*Id.*) Dr. Granberry's impression remained "[s]tatus post left total knee replacement" and "[p]ost traumatic arthritis of the left knee." (*Id.*) Dr. Granberry concluded that the Plaintiff was still "at maximum medical improvement with a 25 percent impairment rating of the lower extremity, which corresponds with a good result." (*Id.*) He noted that the Plaintiff had a lifting limit of 40 pounds, and he prescribed Arthrotec for the Plaintiff's knee pain. (*Id.*)

On February 2, 2011, Dr. Eugene T. Saiter completed a physical residual functional capacity assessment of the Plaintiff. (R. 273-80.) Dr. Saiter's primary

6

diagnosis was status post left total knee replacement. (R. 273.) Dr. Saiter found that the Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk, with normal breaks, for a total of about six hours in an eight-hour workday; sit, with normal breaks, for a total of about six hours in an eight-hour workday; and push and/or pull for an unlimited period of time provided that he did not exceed the amount of weight limits given above. (R. 274.) Dr. Saiter found that his conclusions were supported by Dr. Granberry's January 13, 2011 report, and Dr. Kidd's December 6, 2010 report. (R. 274-75.) Dr. Saiter further found that, occasionally, the Plaintiff could balance, stoop, crouch and climb ramps and stairs. (R. 275.) Dr. Saiter concluded that the Plaintiff could never kneel, crawl or climb ladders, ropes or scaffolds. (*Id.*) Dr. Saiter also noted that the Plaintiff should avoid concentrated exposure to work hazards such as machinery and heights, but that there need not be any limitation on the Plaintiff's exposure to other environmental factors such as extreme cold, extreme heat, wetness, humidity, noise, vibration and fumes. (R. 277.)

## IV.   ALJ's Decision

On May 16, 2012, the ALJ issued a decision finding that the Plaintiff is not disabled. (R. 20-31.) In reaching his decision, the ALJ found that the Plaintiff has not engaged in substantial gainful activity since the alleged onset date of January 30, 2009. (R. 22.)  he ALJ found that the Plaintiff "**has the following severe impairments: osteoarthritis of both knees, status post knee replacement of the left knee, lumbar degenerative disc disease, hypertension, and borderline intellectual functioning**." (*Id.* (emphasis in original).)  The ALJ concluded that the Plaintiff did not meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (R. 23.) The ALJ made the following findings with respect to the Plaintiff's residual functional capacity:

7

> **[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is able to lift and carry 20 pounds occasionally and 10 pounds frequently; stand/walk for two hours total in an eight-hour workday; sit for six hours total in an eight-hour workday; never climb, kneel, crouch, or crawl; occasionally balance; never use foot controls; occasionally tolerate exposure to dangerous heights or dangerous machinery; frequently understand, remember, and carry out short and simple instructions; occasionally understand, remember, and carry out detailed instructions; occasionally interact with the general public and supervisors; to perform work that required only occasional changes in the work setting and work that required him to occasionally set independent goals**.

(R. 25 (emphasis in original).) In light of his RFC determination, the ALJ concluded that the Plaintiff "**is unable to perform any past relevant work**," (R. 29 (emphasis in original)), but that "**there are jobs that exist in significant numbers in the national economy that the claimant can perform**," (*id.* (emphasis in original)).

In reaching his determination regarding the Plaintiff's residual functional capacity, the ALJ recounted all of the medical evidence of record. (*See* R. 26-29.) The ALJ concluded that

> [t]he medical evidence in this case clearly establishes that the claimant suffered a serious injury that exacerbated his arthritis resulting in total knee replacement surgery. There is also evidence of some minimal degenerative disc disease on x-ray, but no mention of clinical signs such as reduced range of motion in the lumbar spine, tenderness or spasms. The undersigned has reduced the claimant's residual functional capacity from work at the heavy or very heavy exertion level to merely a reduced range of work at the light exertion level. Specifically, reducing the claimant's ability to walk or stand to only two hours total will accommodate his osteoarthritis of the knees and left knee replacement and his minimal degenerative disc disease. These impairments are also accommodated [by] reductions in climbing, kneeling, crouching, crawling, balancing, use of foot controls, and exposure to dangerous heights and dangerous machinery. This residual functional capacity also accommodates the claimant's hypertension. These reductions and the residual functional capacity is supported by the post knee replacement opinions of Dr. Granberry at Exhibits 4F and 9F, which is given significant weight, but the undersigned acknowledges that Dr. Granberry did not consider the claimant's minimal degenerative disc disease. Therefore, additional limitations in lifting and standing are included. The undersigned notes that Dr. Granberry is a treating orthopedic specialist, and his opinion is

8

consistent with the objective medical evidence and with the record as a whole. Significant weight is also given to the assessment of Eugene Saiter, M.D., at Exhibit 10F. This medical opinion is consistent with the opinion of the claimant's treating physician. As for Dr. Kidd's opinion that the claimant would have "great difficulty working," the undersigned notes that the greatly reduced residual functional capacity reflects, in part, this onetime assessment. The undersigned notes that Dr. Kidd did not specify if he was referring to the claimant's past work or even what elements of work activity would be difficult. Many, many jobs have been eliminated by the residual functional capacity. The determination of whether ALL jobs would be eliminated by the claimant's limitations is an issue reserved for the Commissioner.

. . .

In sum, the above residual functional capacity assessment is supported by the objective medical evidence; the claimant's treatment records; the claimant's testimony that his pain is best relieved with over-the-counter medication; the claimant's lack of medical treatment for hypertension, right leg pain, and back pain; the opinions of Dr. Saiter, Dr. Kidd, Joanna Koulianos, Ph.D., and Dr. Granberry, which included a mere 25% impairment rating; and the claimant's activities of daily living.

(R. 27-28 & 29.)

### V. Analysis

#### a. The ALJ's Evaluation of Dr. Kidd's Examination Report and Opinion.

Plaintiff's initial claim is that the Commissioner's decision should be reversed because the ALJ failed to state with any particularity the reasons for his obvious rejection of the opinion of the consultative examiner, Dr. Huey Kidd. (Doc. 14, at 5.) There can be no question that "[i]n assessing medical evidence, the ALJ must 'state with particularity the weight he gave the different medical opinions and the reasons therefor.'" *Gray v. Commissioner of Social Security,* 550 Fed.Appx. 850, 854 (11th Cir. Dec. 30, 2013), quoting *Sharfarz v. Bowen,* 825 F.2d 278, 279 (11th Cir. 1987).[2] The Eleventh Circuit has "recognized, however, that the ALJ may implicitly make [such] a

---

[2] "Absent such a statement, a reviewing court cannot determine whether the ultimate decision is supported by substantial evidence." *Shaw v. Astrue,* 392 Fed.Appx. 684, 686 (11th Cir. Aug. 12, 2010), citing *Hudson v. Heckler,* 755 F.2d 781, 786 (11th Cir. 1985) (per curiam).

9

determination." *Kemp v. Astrue,* 308 Fed.Appx. 423, 426 (11th Cir. Jan. 26, 2009), citing *Hutchison v. Bowen,* 787 F.2d 1461, 1463 (11th Cir. 1986). And, of course, it is important to note that the amount of weight to be accorded a particular opinion depends upon the status of the physician. For instance, "the opinions of examining physicians are given more weight tha[n] non-examining physicians and the opinions of treating physicians are given more weight than non-treating physicians." *Snyder v. Commissioner of Social Security,* 330 Fed.Appx. 843, 846 (11th Cir. May 29, 2009), citing 20 C.F.R. § 404.1527(d)(1)-(2); *see also Wilcox v. Commissioner, Social Security Administration,* 442 Fed.Appx. 438, 439-440 (11th Cir. Sept. 21, 2011) ("Generally, the opinions of examining or treating physicians are given more weight than non-examining or non-treating physicians[.]"); *cf. Diamond v. Colvin,* 2013 WL 6231261, *8 (M.D. Fla. Dec. 2, 2013) ("The weight an ALJ must give different medical opinions varies according to the relationship between the medical professional and the claimant."). Moreover, as is relevant here, the opinion of a one-time examining physician, like Dr. Kidd, is "'not entitled to great weight.'" *Rodriquez v. Colvin,* 2013 WL 4495173, *4 (M.D. Fla. Aug. 20, 2013), quoting *Crawford v. Commissioner of Social Security* , 363 F.3d 1155, 1160 (11th Cir. 2004).

On December 6, 2010, plaintiff was consultatively examined by Dr. Kidd. (Tr. 269-270.) Dr. Kidd specifically offered the opinion that he believed Tarvin would have great difficulty working. (*See id.* at 270 ("I do believe it would be very difficult for this gentleman to work.").) According to plaintiff, the ALJ obviously rejected this opinion but failed to state the reasons for such rejection. (Doc. 14, at 6-8.)

A review of the administrative decision reveals that Dr. Kidd's consultative examination was prominently considered by the ALJ in reaching his RFC determination. Indeed, Dr. Kidd appears to have been the only examining physician who diagnosed a back impairment and the ALJ considered plaintiff's degenerative disc

disease (as well as Kidd's diagnosis of osteoarthritis of the knees) in reaching his RFC determination. (*See* Tr. 27-28 & 29; *compare id. with* Tr. 25.) In addition, the ALJ specifically mentioned Dr. Kidd's opinion that Tarvin would have difficulty working but noted that "the greatly reduced" RFC determination reflected in his decision "reflects, in part, this one[-]time assessment." (Tr. 28.) The ALJ also noted that Dr. Kidd's opinion did not make clear that it was directed to all work, as opposed to plaintiff's past work, or, otherwise, what elements of work activity would be difficult for plaintiff to perform. (*Id.*) And, finally, the ALJ importantly observed that "[t]he determination of whether ALL jobs would be eliminated by the claimant's limitations is an issue reserved for the Commissioner." (*Id.*)

Based upon the foregoing, the undersigned finds implicit in the ALJ's decision that he accorded "little" weight to Dr. Kidd's opinion to the extent Dr. Kidd meant to suggest that plaintiff could perform no work whatsoever since such a determination is reserved solely to the Commissioner in the regulations (*see id.*). *See* 20 C.F.R. § 404.1527(d)(1) ("Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability. . . . We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). Since the ALJ had no obligation to give special weight to Dr. Kidd's "belief" that plaintiff

could not work, the Court perceives no error by the ALJ in failing to give additional reasons for his implicit rejection of Dr. Kidd's opinion.

Even assuming the ALJ erred in failing to specify the reasons he gave little to no weight to the opinion of Dr. Kidd, such error was harmless since substantial evidence in the record supports the ALJ's ultimate determination regarding the Plaintiff's residual functional capacity, and Dr. Kidd's examination report and opinion do not directly contradict that RFC determination. *Compare Caldwell v. Barnhart*, 261 Fed.Appx. 188, 191 (11th Cir. Jan. 7, 2008) (holding ALJ's failure to assign weight to examining physician's opinion was harmless because the opinion did not contradict the ALJ's findings) *with Rodriquez, supra,* at *5 ("Any error of the ALJ in assuming that Dr. Shefsky believed that Plaintiff had no limitations does not warrant remand, as substantial evidence otherwise supports the ALJ's decision."); *see Swilling ex rel. L.G.M.W. v. Astrue,* 2011 WL 2982522, *3 (M.D. Ala. Jul. 22, 2011) ("Even though[] the ALJ did not specifically state he considered the teacher's questionnaire, his general comment about opinion evidence is sufficient to show that he did consider all the evidence. Moreover, even if it was error, it is harmless. The opinion of the ALJ shows that he carefully considered the evidence in this case and was extremely familiar with it. A remand is not required.").

  **b. The ALJ did not err by failing to further develop the record with respect to the perceived ambiguity in Dr. Kidd's opinion.**

Plaintiff additionally contends that, at the very least, the ALJ should have re-contacted Dr. Kidd to find out what the consultative physician meant when he opined that plaintiff would have great difficulty working, particularly given the ALJ's statement that Kidd "did not specify if he was referring to the claimant's past work or even what elements of work activity would be difficult[]" (Tr. 28). (*See* Doc. 14, at 8-9.) The Commissioner's regulations require an ALJ "to recontact a physician when there is

not enough evidence in the record to make a decision." *Gardner v. Colvin*, 2013 WL 3873990, *4 (N.D. Ala. Jul. 25, 2013), citing 20 C.F.R. § 404.1520b(c)([1]). "However, if the ALJ can make a decision based upon the evidence, he is not under an obligation to recontact the [] physician." *Id*.

In this case, the ALJ specifically considered Dr. Kidd's diagnoses of lumbar degenerative disc disease and osteoarthritis of both knees (*see* Tr. 270), along with the numerous objective findings and specific limitations attributed to plaintiff's knee condition by treating orthopedists Drs. Michael Granberry and W. Christopher Patton (*see, e.g.,* Tr. 216, 219-226, 233-236, 238, 240, 242, 244-245, 247-248 & 271), and the PCE completed by non-examiner Dr. Eugene T. Saiter (Tr. 273-279), in reaching his RFC determination (*see* Tr. 25, 27-28 & 29). In particular, Dr. Granberry examined Tarvin five weeks after plaintiff was examined by Dr. Kidd (*see* Tr. 271 ("Physical exam today [January 13, 2011] shows a benign knee with a well healed wound. No swelling, deformity, [or] redness . . . . His tenderness is predominately in his calf musculature about midway down. Range of motion is 0 to 115 degrees. No instability.")), and despite noting that Dr. Granberry "continued" plaintiff "with a 40-pound lifting limit" and "maximum medical improvement with a 25 percent impairment rating of the lower extremity, which corresponds with a good result[,]" (*id*.), the ALJ specifically determined that plaintiff's lifting and carrying ability was more limited than indicated by Dr. Granberry (*compare* Tr. 25 *with* Tr. 271) and his ability to stand and walk more limited than suggested by Dr. Saiter (*compare* Tr. 25 *with* Tr. 274) in order to account for Dr. Kidd's diagnoses of lumbar degenerative disc disease and osteoarthritis of both knees (Tr. 27-28). Inasmuch as the foregoing evidence (*see* Tr. 216, 219-226, 233-236, 238, 240, 242, 244-245, 247-248, 269-270, 271 & 273-279) provides substantial support for the ALJ's RFC determination and his decision that plaintiff was not disabled, there was no

13

need for the ALJ to obtain additional information or clarification from Dr. Kidd. *See Couch v. Astrue,* 267 Fed.Appx. 853, 855-856 (11th Cir. Feb. 29, 2008) (finding no duty to recontact existed where substantial evidence supported the ALJ's decision that the claimant was not disabled); *Osborn v. Barnhart,* 194 Fed.Appx. 654, 668-669 (11th Cir. Aug. 24, 2006) (same). This is particularly true where, as here, Dr. Kidd's opinion that plaintiff would have great difficulty working is—as alluded to earlier—an opinion on an issue reserved by the regulations to the Commissioner. *See Gardner, supra,* at *4 ("Opinions such as whether a claimant is disabled, the claimant's residual functional capacity, and the application of vocational factors 'are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability.' 20 C.F.R. §[] 404.1527([d]) []. . . . The questions of Ms. Garner's RFC and whether she is able to work are ultimately questions for the ALJ. The ALJ has no obligation to give special weight to Dr. Poczarek's opinion that Plaintiff is not able to work. This sort of opinion concerns Plaintiff's disability status, the type of decision that is ultimately reserved for the ALJ.").

Because plaintiff makes no other arguments, the Court finds that the Commissioner's fifth-step determination denying benefits is due to be affirmed. *See, e.g., Owens v. Commissioner of Social Security,* 508 Fed.Appx. 881, 883 (11th Cir. Jan. 28, 2013) ("The final step asks whether there are significant numbers of jobs in the national economy that the claimant can perform, given h[er] RFC, age, education, and work experience. The Commissioner bears the burden at step five to show the existence of such jobs . . . [and one] avenue[] by which the ALJ may determine [that] a claimant has the ability to adjust to other work in the national economy . . . [is] by the use of a VE[.]"(internal citations omitted)); *Land v. Commissioner of Social Security,* 494 Fed.Appx.

14

47, 50 (11th Cir. Oct. 26, 2012) ("At step five . . . 'the burden shifts to the Commissioner to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.' The ALJ may rely solely on the testimony of a VE to meet this burden." (internal citations omitted)).

## **CONCLUSION**

In light of the foregoing, it is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 17th day of June, 2014.

                                    s/WILLIAM E. CASSADY
                                    **UNITED STATES MAGISTRATE JUDGE**